You're first, Mr. Frazee. Good morning, Your Honors, and may it please the Court. My name is Jack Frazee, and I represent the appellant, Jillian Whittington. I'm joined today by my co-counsel, Kraft Hughes, although I will be making the arguments today. This case is about fraudulent overdraft fees charged by a credit union to its members. Specifically, my client paid $4,906.50 in overdraft fees in approximately four years. The credit union admitted in its answer that in 2015 alone, it made $9 million in overdraft fees and related revenue. And specifically, the problem with this practice is that it targets credit union members with the least money to their names. We certified three issues to the Court on appeal. The first is that the lower court erred in exercising a post hoc rationalization to discount the plaintiff's justifiable reliance. The second is that the lower court erred in granting summary judgment in light of the facts and evidence and the weight of legal authority. The third is that the lower court erred because mixed statements of fact and opinion can substantiate a fraud claim under Texas law. Now, a fourth issue was raised by the appellees in their response brief about the preemptive effect of the Truth in Savings Act. And if I run out of time to address that in these opening arguments, then I will address that on rebuttal. So returning to my first point, the lower court erred in exercising a post hoc rationalization to discount the plaintiff's justifiable reliance. Specifically, the lower court held, and I'm quoting here, even if MCU's membership disclosures were in some manner false or misleading, Whittington did not act with justifiable reliance on them. And to support this holding, the lower court looked at one specific aspect of the plaintiff's deposition testimony in which she was discussing various aspects of the accounting system with the deposing attorney. But this is incorrect because if you look further into her deposition and the account notes that were held by Mobile Oil Federal Credit Union, you will see that she did not learn how the available balance was being used to assess fees against her until September 23, 2015, several years into the conduct that was harming her. And I will read the account note for the court so you can see what exactly it was they were saying and talking to the member about. And I'm quoting here from page 573 of the record. Member called crying and upset because she had accumulated 12 pay privilege fees in three days for debit card transactions and couldn't understand why. She said she still shows she should have about $20 left. After researching her account, I found that a hotel put a hold on her account for a larger amount, causing a domino effect since we charge fees according to available balance instead of actual balance. It caused the fees to be charged for all debit card transactions that were on hold. Mrs. Whittington's deposition testimony came to this exact note, and she was asked about it. And in response, she said, that's when I figured it out. That's when I learned how they do it. So as you can see from both of these pieces of evidence, she did not know how the system worked until far into their conduct and until she was contacting the credit union to discuss the fact that she had been charged fees she felt were improper. And even then, she was only learning one aspect of how the accounting system worked. We didn't learn the full truth about how the accounting system worked until we got into Discovery and gave evidence to our expert and received greater explanations from their representatives through depositions and through the evidence that they gave to us. And of course, we were sharing this information with our client who was hearing this before deposition. So the lower court erred in thinking that because she was able to explain certain parts of how the system worked at deposition, that she knew this all along and therefore was not justified in relying on misrepresentations. This is a problem because in Texas, justifiable reliance is typically an issue for the fact finder, and we asked that this court reverse so that a fact finder can assess this issue. The second issue on appeal is whether summary judgment was appropriate in light of the evidence and the growing weight of legal authority. The lower court held, quote, MCU's membership disclosures correctly describe how overdraft fees are incurred, and therefore there was no misrepresentation underpinning Whittington's sufficient fraud theory, excuse me, sufficient funds theory, to support her fraud claim. But this is also incorrect. Other courts have looked at similar agreements, and I found at least ten similar cases where courts were asked to look at the ledger balance and available balance distinction. Most recently, the 11th Circuit looked at this issue in Tim's versus LGE Community Credit Union, and in that case, the 11th Circuit decided that at best it was ambiguous whether they were using the ledger balance or available balance method. You would agree there's nothing inherently fraudulent about picking one accounting methodology over another? Yes, Your Honor. There's nothing inherently fraudulent about using the available balance method. It's just that if you're going to use that balance method, you have to disclose how it works, because if you don't, it's very likely to mislead consumers. The Consumer Financial Protection Bureau looked into these practices and found they were likely to mislead and that they were deceptive, and the 11th Circuit's holding actually supports that opinion. Why doesn't paragraph 12A of the membership disclosures provide that disclosure, provide that information? They're using the word available to say available funds or available account balance, and the plain meaning of the term available would lead one to think how much I have in the bank. That's what Mr. Whittington said at deposition. So the word available means they're not using the available method? What it means in the plain meaning of the term is what is available to me, what is accessible to me. But the two methods, as I understand it, one's called ledger balance, the other's called available balance. That's correct. So the word available means they're not using available? Well, the thing is these are terms of art that have all sorts of distinctions to them and added meaning that's very loaded. I can understand how maybe different people, different communities have different understandings of words, but you're making not a disagreement. This is not a meeting of the minds breach of contract case. This is a fraud case. That's correct. How is this fraud? Well, the reason that it's fraud is because when you're using the term available in the fashion that they are, it creates the impression that you're actually describing a ledger balance method. But then when you get into their accounting and how it works, it ends up being completely different, and there are a number of loaded things like their undisclosed subledger of holds that aggregate to artificially depress the balance and create fees where there usually wouldn't be. And if I could read a quote from the Bank of Hawaii, it's Smith versus Bank of Hawaii, and this was the case that the 11th Circuit quoted to explain their opinion that even if you use the word available or available funds or available balance, it's still not enough to put a member on notice. So I'm quoting here from the Smith versus Bank of Hawaii case where they stated, although the account agreement has sporadic references to available funds or balances, there is no statement clearly understood by a reasonable customer the Bank of Hawaii would use the available balance method when determining if an account was overdrawn. They went on to say at no point in either of the agreements does Bank of Hawaii define the meaning of available when describing balances. Bank of Hawaii apparently assumes that the customer will read the word available in six scattered sections spanning the 36-page agreement and come to the conclusion that Bank of Hawaii uses the available balance accounting method when determining overdraft fees, but this assumes too much. So what's the statement made here by the defendant that they were using ledger rather than available? Let me go to that specific language one moment, Your Honor. What I see is a specific warning that the availability of funds may be delayed as described in our policy. Yes, Your Honor. So the term availability there means what's available to you. What's the statement about ledger? Show me the language that tells the world we're not using the available balance method, we're using the ledger balance method. Yes, Your Honor. So if you look at the section titled payment of overdrafts, they say if on any day the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, or transaction or other item posted to your account plus any applicable fee, we may pay or return the overdraft. So what they're saying there is if on any day the funds that are available to you are not sufficient, then you may incur an overdraft. What my client thought... So at most the word available is ambiguous. At most, yes. Okay. That's not enough for fraud. Well... Because the word available might plausibly signal the method that's called available. It might, but that would be an issue for the fact finder to decide, and it's not properly decided on summary judgment because ultimately it comes down to... Is this your best statement of a representation of ledger method? That is... Or do you have anything else? Well, so that is the closest statement. It's really the only statement they make about how fees are going to be charged. And then in the very next sentence they say the credit unit... I mean, this statement is literally true. We're going to let you have access to your available funds. The question, of course, is what do you mean by available? I get that. That's confusing when you think about the subtle differences between ledger and available. But I don't see this being a clear statement that signals to people we're obviously using the ledger and not the available. So the reason why that signals to people is because available balance or available funds in their plain meaning just means what's available to me. When you look at the... Why does it necessarily foreclose these pending holds and deposits? It doesn't necessarily foreclose. It could be that this is ambiguous, but even then we would need a fact finder to decide whether they think this is describing a ledger balance or an available balance. And other courts that have looked at this have agreed that it's ambiguous at best, and the CFPB found that it was actually misleading and deceptive. And part of why it's so misleading and deceptive is... Assume for a second this... We're looking at this account note where they're talking to Jillian Whittington about how she's accrued 20... Or, I'm sorry, 12 overdraft fees, despite the fact that she shows she should have $20 in the bank. So the way that that works is you may look at your available balance online and see, okay, I have $20, so I spend $10 now. You would think that that $10 is not going to incur an overdraft fee because it says $20 is available to you, you've spent $10, you still have $10 in the bank. But then if you do two more successive $10 transactions, that drives it down to negative $10 in your account. All of those three $10 transactions are placed on hold. When they're released from hold maybe two or three days later, they're looking at, okay, what's the available balance now? The available balance... You're saying the way that consumers... Sorry, let me restate it. The way that mobile oil displays account information to its customers looks like Ledger. It does, in part. I thought, though, the record reflected the fact that there are different formats, that if you hit one button you get Ledger, if you go to another website you get Available, which again kind of furthers this ambiguity theory. Yes, Your Honor. So there's a couple of things here. The first is that your account statements are presented to you in a Ledger balance when you get them in the mail or at the end of the month. What the credit union member can do, though, to try and help them understand how much they actually have in the bank is go online and they'll see what their actual balance is and what their available balance is. But the problem is your available balance only reflects what it is at that point in time when you're looking at it. They never tell you what the undisclosed subledger of holds is. So if you start spending money thinking, okay, I have available balance, right here it tells me I have $20. You make three transactions of $10, you're thinking, okay, only one of those overdrafted. But it turns out they're all aggregated in this undisclosed subledger of holds, so then when they get charged to the account, you get three overdraft fees. So that's $90 that have been charged for really one transaction that went under $10 at your account. And I see that I'm running out of time, so I briefly just want to explain why this would support a fraud claim and not just some kind of contract action. So the Hawaii court, which the 11th Circuit looked to to explain its reasoning, actually involved a claim under the Hawaiian Unfair Deceptive Practices Act, which is similar to fraud in that it's looking for misrepresentations. The court stated, and I quote, the court has already rejected Bank of Hawaii's argument that the account agreement explicitly states that Bank of Hawaii will charge overdraft fees based on available balance. At best, the agreements are ambiguous. It is certainly possible that a trier of fact could resolve this ambiguity against Bank of Hawaii and find that the agreements contained deceptive representations. That is, a jury could find that the agreements use the term ledger balance when determining overdraft fees, and because Bank of Hawaii actually used the available balance, this would constitute a material representation likely to mislead consumers. Separately, the jury could find that the agreements simply omit the applicable balance. You've exceeded your time. Oh, I apologize, Your Honor. You'll have to finish that up on rebuttal. Mr. Richter? May it please the court, Stuart Richter on behalf of Mobile Oil. Your Honor, I want to use my time addressing some of the points that counsel raised in the oral argument. I would like to make the point that this case has been and continues to be a bit of a moving target for Mobile Oil. Plaintiffs make an allegation or assert a claim, we make a defense, attack that claim, we win, they change their theory. And that's exactly what they've done here. This is a reviewing court. The scope of an appeal is dictated by the issues that are raised and litigated in the lower court and that are raised in the opening brief. In this court, the ledger balance claim that counsel spent a lot of time arguing was raised for the first time in their opening brief. It was not the fraud theory that was litigated below. They changed course. The fraud theory that they litigated below was another type of a theory called approved positive and settled negative. It's different than the ledger balance theory. I'm counsel in the Bank of Hawaii case. I was counsel in the LG and the Tims case. I'm counsel in probably 30 other cases challenging overdrafts across the country. Counsel, with all due respect, is misrepresenting what those cases are about. You're an overdraft lawyer. Yes, sir. Bit of a subspecialty. But as Judge Ho pointed out, those cases deal with breach of contract. They're all breach of contract cases. And the point there is on motions to dismiss, if the contract's ambiguous, if terms aren't defined, the case gets passed a motion to dismiss. Some of them have gotten passed a motion to dismiss, and to our credit, some of them haven't gotten passed a motion to dismiss. A couple of those cases are cited in the Tims case. A couple of those cases that didn't get passed a motion to dismiss had language very similar to the language in this case, where the available account balance is specifically mentioned. So what's the difference between what they alleged and what they're now arguing? The claim that they alleged is called APPSM. What their expert report was all about, and that's when they finally framed the issues in the lower court is, it applies only to debit cards, and it applies only to debit card transactions when you use your debit card like a credit card. You swipe it, and the merchant asks the credit union to authorize the transaction. Because the credit union, when it authorizes a transaction, is required to pay it, they reduce the available balance by the amount of the authorization. That's your available balance, and that shows you what you can spend. And you can see that when you pick up your phone and your mobile app, which Ms. Whittington testified she did before transactions. You can see it in online banking. If you go to the ATM and withdraw funds, you see it there. And it says in the agreement that she admits she read, and it wasn't signed up for the account. It says, as Judge Ho pointed out, that you get charged overdraft fees when you don't have enough available balance. So what the plaintiffs argued below, what Ms. Whittington argued below, was that it's not fair if I swipe my card and I've got enough available balance at the time I swipe my card. But later, when that debit card transaction is presented for payment, because checks may have cleared or other transactions are engaged, I shouldn't get a fee for that. Because you approved it positive. You set the funds aside. Now they've completely reversed course. They're alleging a ledger balance claim. They're basically saying that I won't get a fee if my ledger balance is sufficient at the time a transaction posts to my account. Not just a debit card transaction, a check, an ACH, any transaction. It's a completely different fraud theory. It wasn't litigated below, and it's not properly before this court. We didn't even have a chance to address that in the summary judgment having to do with fraud. That wasn't one of the issues that the trial court ruled on. The trial court ruled on three issues. It ruled that their APPSN theory, the theory that I won't get a fee if I have enough money when I swipe my debit card, the trial court ruled that doesn't work because of the disclosures Judge Ho alluded to. It specifically says that you're going to get a fee if you don't have, that we assess fees when the matter is presented to us for payment, when it's posted to your account. So that representation doesn't work. The second representation that they alleged was that the credit union said it would only assess overdraft fees if at the end of the day you didn't have a positive balance. Not that it would look at transactions throughout the day as they were presented and posted, but you'd wait until the end of the day, aggregate it, and say, well, if you have a positive balance at the end of the day, even though you didn't during the day, you're not going to get an overdraft fee. And the court, looking at that same language again, said that's not consistent with the language. There's no representation of that. And finally, the final theory or the final representation was that the overdraft protection plan, which is completely different than this courtesy plan, that's where you elect to have money taken from your savings account to cover overdrafts. They alleged that that was fraudulent because it said that it may be less expensive than just incurring an overdraft fee. And of course the court said, well, wait a minute. You only get charged $5.50 if there's a transfer from savings, and you get charged a $30 fee if you get charged an overdraft, so it is less expensive and disposed of that time. The court went on to say, the trial court, in summary judgment, and we agree that this should be affirmed, and that's part of this post hoc argument that the plaintiffs make, is that Ms. Whittington didn't rely on any of those three representations that are the subject of the appeal because she admitted she'd read the agreement, and she admitted in her deposition, again, setting aside the ledger balance theory and what available balance means, focused on the theory that was at issue, the APPS. She admitted she knew that there's a difference between when a transaction is authorized and when it's posted, and she admitted she knew, before she had the conversation that counsel called, when she admitted back in 2010 she knew that overdrafts are assessed based on your balance at the time a transaction is posted, so she couldn't have justifiably relied on any of those representations. So the ledger balance issue shouldn't even be part of this case. If it is, if it isn't, that's what the appellant is hanging her hat on here. There's two things. One, the trial court did rule that claims based on unconscionability, failure to disclose, things like that, are preempted under Gutierrez, and the trial court limited the case to affirmative misrepresentations of fraud. The plaintiff and the appellant is now arguing that the available balance method is, in their opening brief, unconscionable and misleading, because, and she quoted from the Bank of Hawaii case, Judge Seabright did say that in ruling on my motion to dismiss, that available balance wasn't defined, that someone could reasonably interpret that there's different meaning, etc. But that was a breach of contract claim. That wasn't the point of their UDAP claim in that case. You can't compel the credit union to make disclosures. You can't compel the credit union to assess fees in a certain way. That is clear, and that's exactly what they're trying to do. So to the extent they're trying to say the credit union didn't make representations or needed to define terms, that agreement is disposed of based on preemption. They did not appeal from the trial court's ruling on preemption. That is nowhere to be found in their opening brief. We addressed it briefly in our red brief to point out that that's a step they missed. They can't challenge the representations and the unconscionability and the fairness of the practice until they get around preemption, which they didn't do. The first time they addressed it is in their reply brief, and that is improper and should be disregarded. So if you're going to go a step beyond that, look at the ledger balance method. As Judge Ho pointed out, there is no representation of fact. There's no fraudulent statement anywhere, anywhere in the record, in summary judgment, where the credit union said, you don't get a fee if your ledger balance is sufficient at the time a transaction occurs to your account. That is nowhere to be found. It says the opposite. It says you get a fee if you don't have sufficient available account balance. So they can't have a fraud claim based on ledger balance. To the extent this court's going to entertain that argument, the trial court's order should be affirmed, and it should be affirmed on the other two misrepresentation claims, and it should be affirmed because there was no justifiable reliance. Unless the panel has any questions, I'll sit down. Thank you, sir. Thank you. Mr. Frazee, you have five minutes on the bubble. Thank you, Your Honors. I want to begin by just quickly addressing this waiver argument that we never raised any of these issues about ledger balance or available balance in the lower court. That's simply incorrect. If you look at our response to their motion for summary judgment, the opening page has a detailed discussion of this, and we go into great detail about why all of these concepts are relevant, why it's misleading to say that they're charging on available funds rather than ledger balance. We addressed all of that. The other issue that I want to get to is their argument about preemption. The issue here with preemption is that the Truth in Savings Act creates an affirmative duty for them to disclose fees and how they're actually going to be imposed. That's Section 707.4b-4 of the Truth in Savings Act. And what's especially important here is that they're a credit union. Credit unions are supposed to be institutions that members can trust to act in their interests, and given their duty to disclose, which is statutory and regulatory, they need to fully disclose these practices, otherwise they're misleading members, which is what the CFPB found, which is what Bank of Hawaii case has found. The 11th Circuit has endorsed that logic. In Smith v. Bank of Hawaii, it wasn't simply a motion to dismiss that was ruled on. There were two motions for summary judgment, and the court reaffirmed their holding about the fact that it could still be misleading if you're using the words available funds or available balance,  The lower court erred in looking at Gutierrez v. Wells Fargo Bank as the controlling authority for this because that case was looking at regulations promulgated under the National Bank Act by the OCC. We're looking at a credit union which is controlled by regulations promulgated by the NCUA, and they have different disclosure requirements. The correct case to look to for preemption is Rose v. Bank of America, which was decided by the California Supreme Court, in which they said that the Truth and Savings Act has a savings clause, which is Section 4312 of that act, and it says that any state law claim that is compatible with the requirements of the Truth and Savings Act is permissible. We're not asking for anything that is out of step with the Truth and Savings Act. We're asking that they be held to the regulations 707.4b.4, which says you have to disclose what fees you're going to charge and then how they're going to be imposed, and that court was looking at a similar issue of disclosures under the Truth and Savings Act and whether it violated the UCL in California, which also looks at fraudulent practices. That case was then appealed by Bank of America, and the United States Supreme Court denied the petition. So that's been left to stand, and that case is directly on point about whether these kinds of fraudulent practices or unlawful practices that are state law claims can be brought in light of the Truth and Savings Act and what it requires. The idea that we did not address this until our reply brief is also incorrect because we talked about this in our response to the motion to dismiss, in our response to the motion for summary judgment, and they were the ones who brought it up in their response for this appeal. We addressed that issue under the exception that if significant portions of their brief address an issue that we have not raised, then we should be allowed to respond to those in our reply brief. So the assertion that we're raising things on appeal that we've never raised in the trial court is simply not true. We addressed all of these issues in the trial court. They had the opportunity to respond to them and did, and now we're addressing them here in the appellate court. I think their point is not that you forfeited it in district court but that you forfeited it in this court. That's simply incorrect, Your Honor. Where is it in the blue brief? In the blue brief, we made multiple points about how they failed to disclose information. We did not. What page? I apologize. What page? I do not know the specific page because we went through in multiple portions of the brief talking about the fact that they failed to disclose information. At best, their argument is that we didn't explicitly say, we are challenging the preemption ruling of the lower court in verbatim in that kind of a sentence. We didn't make that sort of a statement, but we talked at length throughout the brief about how they failed to disclose information and why that was incorrect. And in our reply brief, we addressed that specifically because they were the ones who raised it in several pages of their brief. Thank you, Your Honors. Thank you, sir. The case will be submitted.